80

John Corona ZARATE, etc., Plaintiffs,

v.

A. Norton YOUNGLOVE, etc. et al., Defendants.

No. CV 78–2376–F(Sx).

United States District Court,
C. D. California.

Feb. 12, 1980.

Eleanor Rehm White, aka Eleanor Rehm Fulkerson, Los Angeles, Cal., for plaintiffs.

Schwartz, Alschuler & Grossman, Los Angeles, Cal., and Roberts, Harrison & Dougherty, Riverside, Cal., for defendants.

## MEMORANDUM OPINION

FERGUSON, District Judge.

John Corona Zarate brought this class action in June, 1978 to challenge alleged discrimination against Hispanics in the employment and promotion practices of the County of Riverside. At the time he applied for positions with the county, Zarate was a district representative to a United States Congressman and held several volunteer positions, including chairmanship of the Advisory Commission to the Riverside County Housing Authority, membership on the Riverside County Affirmative Action Committee, and the presidency of the Inland Counties Health Systems Agency. In addition, Zarate was a leader in Riverside County's Mexican-American community. He alleged that the county unlawfully pressured him to resign influential positions in order to become eligible for county employment, and he asserted that this pressure was part of a pattern of discrimination against Hispanics.

On behalf of himself and others similarly situated, Zarate seeks back pay, an injunction against discriminatory practices, and other appropriate relief. In June, 1979, this court denied plaintiff's requested discovery orders pending a motion for class certification, and in August, 1979, the court took plaintiff's class certification motion off calendar.

■ Defendants have now requested that this court issue an Order Regulating Communication with Potential Class Members.[1] Patterned after a proposed local rule in the Federal Judicial Center's Manual for Complex Litigation, Part 2, § 1.41 (1977),[2] the

1. The proposed order provides:

1. In this action, all parties hereto and their counsel and their officers, agents and employees, are forbidden directly or indirectly, orally or in writing, to communicate concerning such action with any potential plaintiff not a formal party to the action without the consent and approval of this Court.

2. Any proposed communication shall be presented to this Court in writing with a designation of or description of all addressees, together with a motion and proposed Order.

3. The communications forbidden by this order include but are not limited to the following:

a. solicitation directly or indirectly of legal representation of potential plaintiffs who are not formal parties to the action;

b. solicitation of fees and expenses and agreements to pay fees and expenses from potential plaintiffs, in intervention, who are not formal parties to the action;

c. solicitation by parties to the action to any potential plaintiff not a formal party to this action, to take a position concerning the action;

d. communications from counsel which may tend to misrepresent the status, purposes and effects of the action, and of any actual or potential court orders therein which may create impressions tending, without cause, to reflect adversely on any party, any counsel, this court, or any administration of justice.

The obligations and prohibitions of this Order are not exclusive. All other ethical, legal and equitable obligations are unaffected by this Order.

4. This Order does not forbid:

a. communications between an attorney and his or her client or a prospective client or the attorney representing a prospective client, who has on the initiative of the client or prospective client or the attorney representing a prospective client, consulted with, employed or proposed to employ the attorney;

b. communications occurring in the regular course of business, including but not limited to communications to state and federal regulatory agencies which do not have the effect of soliciting representation by counsel, or misrepresenting the status, purposes or effect of the action and orders therein.

2. Defendants' proposed order is nearly identical to that suggested in the Manual. Defendants did, however, add one provision and eliminate one provision. They added the specific proscription of parties soliciting potential plaintiffs who are not formal parties to take a position concerning the action (subsection 2(c)); and they eliminated a subdivision prohibiting

order forbids parties and their counsel from communicating about the action with potential class members unless the court reviews and approves the communications before their distribution.

Specifically forbidden communications with potential class members who are not formal parties to the action include solicitation of fees and expenses or of rhetorical support and direct or indirect solicitation of legal representation. The order also proscribes "communications which tend to misrepresent the status, purposes and effects of the action and of actual or potential court orders, which may create impressions tending, without cause, to reflect adversely on any party, any counsel, this court, or any administration of justice."

Granting such an order would greatly hamper the progress of the class action and seriously infringe the first amendment rights of parties, counsel, and the public. Because the public interests served by the order either are insufficient to justify this infringement or could be satisfied by restrictions tailored much more narrowly, this court declines to issue the requested order. This decision is explicated here at some length because of the importance of the competing interests involved and the dearth of case law assessing the impact of the Supreme Court's 1978 lawyer solicitation decisions, *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), and *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), on the proposed order.

---

solicitation by formal parties of requests by class members to opt out in class actions under subparagraph (b)(3) or Rule 23.

Also, the defendants' proposed order omits an exception to the operation of the rule as stated in the Manual:

Nor does the rule forbid communications protected by a constitutional right. However, in the latter instance the person making the communication shall within five days after such communication file with the Court a copy of such communication, if in writing, or an accurate and substantially complete summary of the communications if oral.

Manual for Complex Litigation, Part 2, Suggested Local Rule No. 7, § 1.41.

## I. PURPOSE OF THE REQUESTED ORDER

Defendants argue that the proposed order will prevent abuses of the class action process that have occurred already in this action or that will occur in the future. Their arguments focus primarily on two sets of communications from plaintiff or his attorney to potential class members. The first set began with an advertisement which ran in March in the *Riverside Press* (seven days) and in one Spanish language newspaper (one day). The two-column advertisement read:

ATTENTION ALL HISPANIC

If you have been an applicant for employment or promotion for the County of Riverside since 1975 and have received an interview and not hired, a rejection notice, or no response, you are a potential recipient of back pay because of discriminatory employment practices. FOR ADDITIONAL INFORMATION PLEASE CONTACT JUAN CORONA ZARATE [phone number] OR WRITE TO [address].

The advertisement closed with boxes to check to indicate whether the applicant was interviewed and not hired or received a rejection notice or no response. Twenty-two persons responded to the advertisement, and plaintiff's counsel sent each of them a letter informing them that Zarate had filed a lawsuit to stop discriminatory practices and asking for information about their experiences.[3] If a respondent provided information indicating the possibility of discrimination, plaintiff's attorney sent a

---

**3.** The letter stated:

Dear _____:

This office is seeking information about employment discrimination by the County of Riverside against persons of Hispanic origin. Your experiences may be helpful in a lawsuit that has been filed by Juan Corona Zarate to stop such practices.

I would like to find out more about what happened to you and to arrange an interview if it is agreeable to you.

For your convenience, I am enclosing a self-addressed card for your reply.

If you have any questions, please phone my office [phone number] or Juan Zarate at [phone number].

second letter advising him that he should file a formal charge of discrimination with the California Fair Employment Practices Commission or with the federal Equal Employment Opportunity Commission and asking for a copy of any such charges filed.[4] None of the 22 respondents joined the suit as named plaintiffs.

The second phase of communications was an advertisement that plaintiff's counsel placed in the *Riverside Enterprise* for several days in July. The advertisement read: "Persons with information about discrimination against Hispanic applicants for jobs with the County of Riverside please call [phone number]" (the listed telephone number belonged to plaintiff's attorney). This advertisement was not addressed to Hispanics who had suffered discrimination, and none called in response to it.

In plaintiff's answers to defendants' first set of interrogatories, he stated that he had placed the former advertisement, and he described the attendant circumstances. In defendants' second set of interrogatories, they asked, "Please state whether you or any counsel of yours has ever advertised for or otherwise sought out people who may be members of the class on whose behalf you purport to sue." Mr. Zarate again indicated that he had placed the former advertisement, but he did not mention the latter.

Defendants decry this omission and suggest that both it and plaintiff's "solicitation of potential class members" demonstrate the need for court approval of the order. In support of this argument, at the hearing on the motion, defendants pointed to the 22 persons who responded to plaintiff's first advertisement but did not join the suit as named plaintiffs. In addition, they fear

that future communications may misrepresent the status, purpose or effect of the action. Defendants also assert that they have been harmed directly by the advertisements, because such adverse publicity discourages minority applicants for county employment.

Some of the courts that have upheld § 1.41 rules or orders have focused their attention on the desirability of preventing solicitation. *See Waldo v. Lakeshore Estates, Inc.*, 433 F.Supp. 782, 789–90 (E.D.La. 1977). *Cf. State of Ohio v. Richter Concrete Corp.*, 69 F.R.D. 604, 606–07 (S.D.Ohio 1975) (order's proscription did not apply to government attorneys because there was no danger of solicitation for financial gain). Other courts, because of the status of particular cases, have focused instead on the dangers of misrepresentation and unfair pressure inherent in unsupervised communications during class suits. *See David Ungar v. Dunkin' Donuts of America, Inc.*, [1975–1] Trade Cases ¶ 60,361 (E.D.Pa.1975) (class already was certified; court feared pressure from defendant to opt out of class in antitrust suit); *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.*, 53 F.R.D. 647, 652 (E.D.N.Y. 1971) (court feared communications from parties might put unfair pressure on potential class members).

In appropriate settings, the dangers of either solicitation or misrepresentation could justify regulation of speech. This regulation, however, must withstand analysis on two levels: first, the court must have the power to issue the regulation; and second, if it does have the power, the regulation must not exceed constitutional bounds. In a purely commercial context,

4. The second letter stated:

Dear _____:

In order to preserve your right to assert a claim for damages based upon the discriminatory incident you have suffered, it is advised that you should file a formal Charge of discrimination against the County of Riverside with the Fair Employment Practices Commission: 303 West Third Street, Room 150, San Bernardino, California 92401, (714) 383–4698, or with the appropriate federal office of the Equal Employment Opportunity Commission: 3255 Wilshire Boulevard, 9th Floor, Los Angeles, California 90010, (213) 688–3400.

If you have already filed such a Charge, you should make certain that your Charge is still current, and that any incidents that have occurred since you filed the original Charge are added to it by amendment or by filing a new Charge.

Please send a copy of any such Charge to this office. Thank you.

the Supreme Court has made it clear that the government may sometimes prevent speech that is potentially misleading, at least where that speech has "no intrinsic meaning." *Friedman v. Rogers*, 440 U.S. 1, 12–13, 99 S.Ct. 887, 895–896, 59 L.Ed.2d 100 (1978). Outside the purely commercial setting, however, the court cannot permit mere incantation of the word "misrepresentation" to open the door to restrictions of speech. Accordingly, the permissibility of issuing the proposed order to prevent the evils attendant on solicitation and misrepresentation will depend in part on whether the proscribed speech is properly characterized as commercial or political. Analysis of that question follows in Section IV of this opinion. Before reaching that issue, it is necessary to consider the power of the district court to issue a § 1.41 order.

## II. POWER OF THE COURT TO ISSUE A SECTION 1.41 ORDER

Since the Federal Judicial Center first proposed adoption of a local rule regulating communications with potential class members in 1970, *see* Manual for Complex and Multidistrict Litigation § 1.61, 49 F.R.D. 217, 218–19 (1970), a number of judicial districts have adopted the rule,[5] either as initially drafted, or as later refined in light of first amendment concerns that some courts and commentators expressed. *See*

*Rodgers v. United States Steel Corp.*, 508 F.2d 152, 162–63 (3rd Cir. 1975); Wilson, *Control of Class Action Abuses Through Regulation of Communications*, 4 Class Action Reports 632 (1977); Note, "Developments in the Law—Class Actions," 89 Harv. L.Rev. 1318, 1601 (1976); Note, 88 Harv.L. Rev. 1911, 1921–22 (1975). On occasion, courts in districts without such rules have issued orders to the same effect.[6]

Faced with challenges to the rules or orders, courts have expressed differing views on the power of district courts to regulate the communications and on the propriety of such regulation under the first amendment.[7] The Central District of California has no such rule; and the Ninth Circuit Court of Appeals has not had occasion to address the issues presented by this motion. Unfortunately, nearly all the reported decisions on these issues predate the last few years' expansion in awareness of lawyers' and listeners' first amendment rights. *See In re Primus, supra*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *Ohralik v. Ohio State Bar Assoc., supra*, 436 U.S. at 459, 98 S.Ct. at 1901 (1978); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (all discussing first amendment rights of lawyers); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d

---

**5.** *See* S.D.Fla.R. 19 B; N.D.Ga.R. 221.2 & 221.3; N.D.Ill. (Civ.) R. 22; S.D.Ohio R. 3.9.4; S.D. Tex.R. 6; W.D.Wash. (Civ.) R. 23(g). *See also* W.D.Pa.R. 34(d), *disapproved in Rodgers v. United States Steel Corp.*, 508 F.2d 152 (3d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); Md.R. 20.

**6.** *See, e. g. Coles v. Marsh*, 560 F.2d 186 (3d Cir. 1977); *State of Ohio v. Richter Concrete Corp.*, 69 F.R.D. 604, 606–07 (S.D.Ohio 1975); *David Ungar v. Dunkin' Donuts of America, Inc.*, [1975–1] Trade Cas. ¶ 60,361 (E.D.Pa. 1975); *Amer. Fin. Sys. Inc. v. Pickrel*, 18 Fed. Rules Serv.2d 292, 296, 315 (D.Md.1974); *Vance v. Fashion Two Twenty, Inc.*, 16 Fed. Rules Serv.2d 1513, 1513–14 (N.D.Ohio 1973); *Merit Motors, Inc. v. Chrysler Corp.*, 1973–1 Trade Cas. ¶ 74,288, at 93,321 (D.D.C.1972); *Di Costanzo v. Chrysler Corp.*, 57 F.R.D. 495 (E.D. Pa.1972); *San Diego v. Rockwell Mfg. Co.*, No. C–50190 (N.D.Cal.1970); *Moore v. Atlas Subsidiaries of Delaware, Inc.*, CV No. 2772–68 (D.D.C. April 23, 1970); *Vanlandingham v.*

*Denny's Restaurants*, CV No. 69–424 (D.Or. Oct. 29, 1970); *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.*, 43 F.R.D. 452, 464 (E.D. Pa.1968); *Siegel v. Chicken Delight, Inc.*, 271 F.Supp. 722, 728 (N.D.Cal.1967). *See also Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc.*, 455 F.2d 770 (2d Cir. 1972).

**7.** This opinion analyzes the differing views on district court power, *infra*. For conflicting positions on the first amendment issue, *compare Rodgers v. United States Steel Corp.*, 508 F.2d 152, 162–63 (3d Cir. 1975), with *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1261–62 (5th Cir. 1979), *reh'g en banc granted*, 604 F.2d 449 (5th Cir. 1979). *See also In re Agent Orange Product Liability Litigation*, 475 F.Supp. 928 (E.D.N.Y. 1979). This court addresses the first amendment issues in the context of controlling misrepresentations, *infra*, in Section IV of the Opinion.

707 (1978) (first amendment protects rights of audience). Accordingly, this court must make its own analysis of the issues presented, giving, of course, great weight to the reasoning detailed by courts elsewhere.

Plaintiff here has not challenged the power of the court to issue the order; he focuses his attack on the asserted impropriety of the order under the first amendment. Nevertheless the analysis here must begin by addressing the issue of the power of this court to grant the requested order, since a negative answer to that inquiry would obviate the necessity for a constitutional assessment. *Rodgers v. United States Steel Corp., supra,* 508 F.2d at 163; *see Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 271–72, 97 S.Ct. 1740, 1744–1745, 52 L.Ed.2d 304 (1976).

### A. Sources of Power

Appellate courts and commentators have disagreed as to whether issuance of § 1.41 or similar rules or orders exceeds the proper authority of district courts. *Compare Coles v. Marsh,* 560 F.2d 186 (3d Cir. 1977); *Rodgers v. United States Steel Corp., supra,* at 162–65; *and* Note, 88 Harv.L.Rev. 1911, 1913–17 (1975) (local rule meets strictures of the Rules Enabling Act, 28 U.S.C. § 2072, and Fed.R.Civ.P. 83 but is impermissible because inconsistent with Fed.R.Civ.P. 23); *with Bernard v. Gulf Oil Co.,* 596 F.2d 1249, 1259 (5th Cir. 1979), *reh'g. en banc granted,* 604 F.2d 449 (5th Cir. 1979); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1791 (power exists under Fed.R.Civ.P. 23(d)). *See also Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.,* 455 F.2d 770, 775 (2d Cir. 1972).

Three primary sources delineate judicial power to govern class action practice in the courts. Under 28 U.S.C. § 2071,[8] the courts are empowered to proscribe rules for the conduct of their business, so long as the rules are consistent with federal rules and statutes. Fed.R.Civ.P. 83[9] permits the courts to enact local rules consistent with the federal rules and, where no rule applies, to regulate their practice in any manner consistent with the federal rules. Finally, Rule 23(d)(3)[10] authorizes the trial court to make appropriate orders imposing conditions on the representative parties.

In *Rodgers v. United States Steel Corp., supra,* the Third Circuit decided that neither Fed.R.Civ.P. 83 nor 28 U.S.C. § 2071 empowered the district court to enact a *rule* forbidding communication from parties or their counsel to potential or actual class members not formal parties.[11] Black employees of defendant, who were attempting to prosecute a class action against United States Steel, had challenged the rule as violative of their speech and associational rights, *id.* at 163, because it prevented them from communicating with other black employees or the local National Association for the Advancement of Colored People about their position that black employees should

---

**8.** 28 U.S.C. § 2071 provides: "The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed by the Supreme Court."

**9.** Rule 83 provides:

Each district court by action of a majority of the judges thereof may from time to time make and amend rules governing its practice not inconsistent with these rules. Copies of rules and amendments so made by any district court shall upon their promulgation be furnished to the Supreme Court of the United States. In all cases not provided for by rule, the district courts may regulate their practice in any manner not inconsistent with these rules.

**10.** Fed.R.Civ.P. 23(d)(3) provides: "In the conduct of actions to which this rule applies, the court may make appropriate orders: * * * (3) imposing conditions on the representative parties or on intervenors; * * *"

**11.** The portion of the local rule invalidated in *Rodgers* stated:

(d) No communication concerning [the] action shall be made in any way by any of the parties thereto, or by their counsel, with any potential or actual class member, who is not a formal party to the action, until such time as an order may be entered by the Court approving the communication.

*Rodgers v. United States Steel, supra,* 508 F.2d at 155–56.

not approve a consent decree that plaintiffs contended was a sweetheart contract between their union and the defendant. Parties who approved the consent decree, which was entered in another court, would effectively be opting out of the class for which plaintiffs were seeking certification.

The court held that the rule, which was designed to prevent barratry, was inconsistent with the policy of Fed.R.Civ.P. 23 favoring class action litigation disposing in a single lawsuit all cases in which common interests or questions of fact prevail. Because it found an inconsistency, the court concluded that neither of the two grants of rule-making authority permitted passage of such a rule. The court based its decision on the requirement in both rule-making grants that rules enacted be consistent with the Federal Rules and on the absence of "legislative authority to regulate the practice of law." *Id.* at 163.

The court of appeals noted that the Manual's proposed rule, unlike the local rule at issue there, contained exceptions to its operation. Yet, the court implied that even the Manual's rule was flawed because it did not propose "specific rules aimed at specific abuses," *id.* at 164, and because the drafters apparently assumed that the district courts were vested with unreviewable discretion to impose prior restraints on communications or association, *id.* at 165.

Then, in *Coles v. Marsh, supra,* also an employment discrimination class action, the court expanded its holding to proscribe adoption of a § 1.41 *order*[12] "without a specific record showing by the moving party of the particular abuses by which [frustration of the policies of Rule 23] is threatened." *Id.* at 189. First, the court assayed the abuses that defendant asserted were demonstrated by plaintiff's conduct up to the time of the motion. The plaintiff, who had filed a class action suit charging employment discrimination, had contacted and intended to continue contacting former employees of defendant with the hope of inter-

esting them in participating in the suit. Plaintiff had also communicated with the NAACP and planned to get in touch with other organizations to obtain financial support for the litigation. Finally, plaintiff had spoken with a radio programmer she hoped would provide free advertising. Plaintiff's attorney knew of and had not attempted to restrict plaintiff's conduct.

The court of appeals determined that such activities did not represent abuses of the class action device but, "[r]ather, . . . were directed toward effectuating the purposes of Rule 23 by encouraging common participation in the litigation of her sex/race discrimination claim." *Id.* at 189. Thus, the court concluded, Rule 23(d) did not provide a source of power for imposition of the order. *Id.* at 189 n.2. The court then held that the portions of the order concerning solicitations of representation or fees were directed to ethical norms and not to abuses of the class action device and, therefore, exceeded the court's power as delimited in *Rodgers.* The court did conclude that the remainder of the order forbidding misrepresentations and solicitation of requests to opt out of the class could be consistent with the policies of Rule 23, but it held that defendant had not shown any likelihood that either type of communication would occur or would prejudice it. Finally, the court held that "[i]mposition of an order on anything less than a clear showing of particularized need removes it from the area of discretion unreviewable by mandamus." *Id.* at 189.

Recently, the Fifth Circuit took a contrary position in *Bernard v. Gulf Oil Co., supra,* another employment discrimination class action, and held that "the order was a permissible exercise of the trial court's discretionary power in controlling a class action." *Id.* at 1259. Taking a broad view of a trial court's power to control conduct of the action under the Federal Rules, *see id.* at 1259 n.11, the court held:

---

12. The order that the district court had entered in *Coles* closely paralleled the rule proposed in the Manual for Complex Litigation, Part 2, Sug-

gested Local Rule No. 7 (1977). The order differs in certain respects from the order at issue here. *See* n.2, *supra.*

Rule 23 imposes on the trial judge the duty of assuring that a class action is an appropriate way to resolve the controversy, the representative parties will fairly and adequately protect the interests of the class, the pleading and trial of the case is conducted fairly and efficiently, and any settlement or compromise is not unfavorable to the class.

*Id.* at 1259 (footnote omitted).

The court accepted the Manual's view that communications to class members might mislead them by "appearing to reflect the opinion of the court rather than that of the party making the communication," *id.* at 1260, and concluded that the trial court should therefore have the power to screen the communications to protect the parties against being so misled. Moreover, the court feared that any misleading statements during an opt-out period would be irreparable.[13] Finally, the court held, the trial judge might believe that "requiring prior approval of communications will reduce the risk of class members becoming confused by an avalanche of notices, inquiries, and arguments directed to them by each of the parties to this action." *Id.* at 1260.

Addressing plaintiff's argument that the order would hamper discovery and prevent him from informing class members of their civil rights, the court said that the trial court would exercise only "minimal judicial control of these communications," *id.* at 1260, *citing* Manual for Complex Litigation, Part 1, § 1.41 at 29 (C. Wright & A. Miller ed. 1977), and that this control would not prejudice defendants. Finally, the court balanced the policy of Rule 23 to encourage common participation in the suit against "the same Rule's explicit grant of authority to the trial court to control the conduct and settlement of the action," *id.*, and found the latter to outweigh the former.

Judge Godbold dissented from the portion of the opinion discussing the § 1.41 order and, instead, took an approach to the power question similar to that of the Third Circuit in *Coles v. Marsh, supra.* He concluded that restrictions are appropriate under Rule 23(d) only "upon a factual showing by the moving party that unsupervised communications between counsel and named plaintiffs on one hand and potential class members on the other have materialized into actual abuses of the class action device or that abuses are imminently threatened." *Id.* at 1267 (Godbold, J., concurring in part and dissenting in part) (footnote omitted).

The remaining appellate decision on § 1.41 rules or orders addressed a distinctly different issue. In *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc., supra,* 455 F.2d at 775, the court, without any discussion of the district court's power to issue orders restricting or approving communications, refused to issue

---

**13.** As noted earlier, *see* n.2, *supra*, defendants' requested order does not specifically proscribe communications during an opt-out period. In all probability, there would be no opt-out period in this class action because the action would proceed under Rule 23(b)(2), not under 23(b)(3). If there were an opt-out period, the difficulty in repairing damage from misstatements during that limited time might well justify court control. *In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1139 (7th Cir. 1979) (degree of district court review should vary with the potential for abuse that the communications present); *Ungar v. Dunkin' Donuts,* [1975–1] Trade Cases ¶ 60,-361. While the usual cure for false speech is more speech, *see Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976); *Capital Broadcasting Co. v. Mitchell,* 333 F.Supp. 582, 590 (1971) (Wright, J., dissenting), *aff'd sub nom. Capital Broad-* casting Co. v. Acting Attorney General, 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972), there might be no time for more speech before the party opted out.

Of course, remedies other than proscription of the speech would be available, such as permitting the party to rejoin the class if he opted out as a result of misinformation. Such an approach is similar to the one some courts have taken in refusing to consider non-participation or conflict of interest statements when deciding class certification issues. *See Aamco Automatic Transmissions, Inc. v. Tayloe,* 67 F.R.D. 440, 447 (E.D.Pa.1975). *Cf. Matarazzo v. Friendly Ice Cream Co.,* 62 F.R.D. 65, 79 (E.D.N.Y.1974) (court rejects Manual's disapproval of communications where there is no evidence of abuse, yet still refuses to consider non-participation statements). Nonetheless, a court might well conclude that the harmful results of misstatements during the opt-out period would justify forbidding them.

a writ of mandamus against a district court's order approving certain communications under an earlier § 1.41-type order. The court reasoned that the order approving the communications was "well within the wide range of discretion in the management of class actions necessarily accorded the district judge by Fed.R.Civ.P. 23(d)." Id. at 775.[14]

Earlier in that same litigation, a district court had granted a different order restricting certain specified communications after concluding that Rule 23(d) gave it the power to deal with abuses of the class action process, Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc., 53 F.R.D. 647, 651 (E.D.Pa.1971), and finding a potential for abuse, id. at 652 n.2. Apparently, the court considered the potential for abuse to be a sufficient basis for issuing a restrictive order.[15]

The only other district court opinion addressing the power of the court to issue such orders[16] is Waldo v. Lakeshore Estates, Inc., 433 F.Supp. 782 (E.D.La.1977). Waldo rejected the Third Circuit's reasoning in Rodgers and stated, "[W]e categorically oppose the notion that a policy allowing unfettered communications to encourage participation in a class suit is consistent with the purpose of Federal Rule 23. The potential abuses attendant upon such unregulated communication clearly undermine the efficacy of the class action device." Id. at 794. The Waldo court did not, however, articulate the statutory basis for the power it felt authorized to exercise.

## B. Assessment of Power

Confronted with the foregoing inconsistent conclusions, this court must make its

14. The Manual interprets the Weight Watchers opinion expansively: "The almost unreviewable discretion of the trial court to regulate communications between counsel and class members has been confirmed in Weight Watchers of Philadelphia, Inc., v. Weight Watchers International, Inc., 455 F.2d 770 (2d Cir. 1972)." Manual, supra, at 27–28 n.33.

This interpretation, however, takes the Weight Watchers opinion considerably farther than it went. The appellants in Weight Watcher's had asked the court of appeals to prevent publication of a communication that a district court had approved under a § 1.41-type order. Refusing to review a district court's approval of a specific communication is entirely different from refusing to review a district court order suppressing communications. The Manual's assertion notwithstanding, a court of appeals' power to review a § 1.41 order or rule proscribing communications is undisputed. See Coles v. Marsh, supra; Rodgers v. United States Steel Corp., supra. Even the Fifth Circuit, which approved the order in Bernard, did so only after lengthy discussion of the power of the court to issue the order. Bernard v. Gulf Oil Co., supra, 596 F.2d at 1258–61. Holding an order forbidding communications to be unappealable would seriously compound the problems that such an order presents.

In accord with Weight Watchers is Rodgers v. United States Steel Corp., 541 F.2d 365, 371 (3d Cir. 1976) (a different phase of the litigation from that discussed earlier). But see Bernard v. Gulf Oil, supra, 596 F.2d at 1261–62 (finding decisions denying or approving specific communications to be reviewable). The Rodgers II court refused review under the collateral order doctrine of an order permitting defendants to tender back pay to class members in settlement of their claims. Citing Weight Watchers, the court held:

> Here, to the extent the court's approval of specific language in the notice and release forms, or of the amount offered, or of the sending of the Equal Employment Opportunity Commission letters or of the procedure for the tender process impacts on the voluntariness of the execution of a release by a particular class member or on the enforceability of the release by appellees, that approval can be effectively reviewed at final judgment with no attendant loss of rights. Should the tender be subsequently invalidated, appellants will be placed in the same position as had the tender never occurred.

Rodgers v. United States Steel Corp., supra, 541 F.2d at 371 (footnote omitted) (emphasis added). When a court issues § 1.41 rules or orders, by contrast, review after final judgment would be far too late to preserve vital rights of both parties.

15. After the lower court's decision in Weight Watchers, Supreme Court decisions on regulation of commercial speech made it clear that mere potential for harm from speech justified regulation only in certain limited, purely commercial contexts. See section IV of this opinion, infra.

16. In other instances when district courts have issued § 1.41 orders, they have done so without publishing an opinion, or, if they have published an opinion, the opinion has not articulated the source for the power the court was exercising. See cases cited in footnote 6, supra.

own assessment of the powers properly reposed in a district court to deal with abuses of the class action process. The court selects its path with care, mindful that the way is bounded on the one side by the court's responsibility to control the conduct of the litigation before it and on the other by the interests of the parties in communications facilitating the class action. The guideposts for the assessment are Federal Rule 83 and Federal Rule 23(d)(4); 28 U.S.C. § 2071 authorizes rulemaking and is not a source of power for the issuance of orders.

### 1. *Rule 83*

 Whether Rule 83 authorizes adoption of the order requested here depends upon: (1) whether the order regulates "practice"; and (2) whether the order is consistent with the federal rules.[17] The "practice" limitation appears to have been designed to limit the orders under Rule 83 to "procedural details and matters overlooked in preparing the rules," Green, The Admissibility of Evidence Under the Federal Rules, 55 Harv.L.Rev. 197, 206 (1941), in order to avoid running afoul of the requirement in the Rules Enabling Act that the federal rules shall not modify any "substantive right." 28 U.S.C. § 2072.[18] The district court's powers under Rule 83, however, are not so limited as might appear at first glance. While the rule may contemplate preoccupation with such minor matters as enforcement of time deadlines, it is clear that the district court also has the power and the responsibility to "controll[ ] the conduct of lawyers practicing before [it]." *Gas-A-Tron of Arizona v. Union Oil of California*, 534 F.2d 1322, 1325 (9th Cir.), *cert.*

denied, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). Moreover, this power extends to the control of attorney conduct outside the courtroom. In *United States v. Hvass*, 355 U.S. 570, 78 S.Ct. 501, 2 L.Ed.2d 495 (1958), the Court authorized the district court to act by rule to prohibit solicitation of personal injury cases. Since the rulemaking power and the power to issue orders are limited by the same language in Rule 83, it is clear that the rule permits the courts some leeway in issuing orders, at least for the regulation of attorneys. The "practice" limitation, then, would not prevent a court from issuing an order regulating conduct of attorneys that was directly related to a pending case. There is no authority suggesting that Rule 83 authorizes regulation of the parties to an action, however.

The issue of consistency with the Federal Rules is more complicated, as it necessitates a decision whether literal, textual inconsistency is required or whether a conflict with the policy of a federal rule will suffice to invalidate an order. Because reported decisions rarely rely on the non-rulemaking portion of Rule 83, 12 C. Wright & A. Miller, Federal Prac. & Proc. § 3155, we must again look to decisions respecting Rule 83 rulemaking for guidance in interpreting the consistency requirement. Unfortunately, there is no bright line of decisions illuminating the question. Instead, courts sometimes have invalidated or approved local rules on the basis of presence or absence of direct conflict with the Federal Rules, *see Wingo v. Wedding*, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974); *Colgrove v. Battin*, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), and other times have

---

**17.** For a thorough analysis of the requirements that Rule 83 imposes on passage of local rules, *see* Note, 88 Harv.L.Rev. 1911, 1913–15 (1975). This analysis applies equally to orders because the language of Rule 83 is nearly the same with respect to both rules and orders.

**18.** *But see* Note, 88 Harv.L.Rev. 1911, 1915–16 n.38 (1975), where the author suggests that local rules may modify substantive rights without conflicting with the Rules Enabling Act, because the Rules Enabling Act applies only to the federal rules. That argument is erroneous,

however, because the power to make local rules comes from a federal rule, and that federal rule is limited by the Rules Enabling Act. If the Supreme Court could enact a federal rule authorizing adoption of local rules that did not comply with the requirements of the Rules Enabling Act, such rules could strip the Enabling Act of all meaning. Surely it would be anomalous for the Rules Enabling Act to permit passage of a federal rule delegating powers greater than those the rule itself could possess.

looked to whether the local rule subverted a purpose of the Federal Rules, *see Bernard v. Gulf Oil Co., supra,* at 1260; *Rodgers v. United States Steel, supra,* at 163; *Coles v. Marsh, supra,* at 189; *Farmer v. Arabian American Oil Co.,* 285 F.2d 720 (2d Cir. 1960) (local rule could not authorize imposition of court costs so high that plaintiff would be denied his day in court, because purpose of rules was to facilitate just disposition of a case on its merits).

In the case at bar, the inquiry cannot end with a comparison of the requested order with the language of Rule 23. The rule provides a comprehensive statement of the court's powers to govern a class action proceeding, and a reading of the rule as a whole along with the Advisory Committee Notes is necessary to provide a court with a clear understanding of the rule's intended grant of authority to the trial court. Thus, courts confronting challenges to § 1.41 rules or orders properly have looked to the policy behind Rule 23. Note, *supra,* 88 Harv.L. Rev. at 1917.

This policy is one favoring class action litigation disposing in a single lawsuit all cases in which common questions of law and fact prevail. *Rodgers v. United States Steel, supra,* 508 F.2d at 163. As the synopses of the opinions presented earlier reveal, all courts addressing the propriety of § 1.41 rules or orders agree that this policy is an important factor in evaluating a proposed order. Where the courts differ is in their evaluations of the balance struck between the desire to prevent abuses of the class action procedure and the policy favoring the action. The Third Circuit gives greater weight to the policy, and the Fifth Circuit and the district court in *Waldo* find avoidance of potential abuses the more important interest.

This court has no doubt that a court, in order to ensure proper management of the class action, may impose significant constraints on the attorneys appearing before it. In a number of contexts, the rules explicitly authorize judicial involvement that would, in any other setting, be antithetical to the well-established norms of judicial passivity. *See, e. g.,* Fed.R.Civ.P. 23(d)(2). Nonetheless, because of the strong policy favoring class actions when they are appropriate, this court concludes that a trial court may not issue an order under Rule 83 restricting communications between counsel and others if that order will hamper the class representative in prosecuting the class action, unless the court concludes that actual or threatened abuses of the class action process require issuance of the order.

It is important to distinguish threatened abuses from potential abuses. The former are likely to occur and, therefore, justify restrictions even at some cost to furtherance of the class action. Potential abuses, on the other hand, are merely abuses that could occur, and it would be improper to permit the mere spectre of these abuses to lead the court to impose restrictions that could hinder progress of the class action. In so concluding, this court necessarily rejects the viewpoint that potential abuse is a sufficient justification for imposing restrictions.[19] Speculative harm simply is inadequate to outweigh the important interests in furthering appropriate class actions. *Coles v. Marsh, supra,* 560 F.2d at 189.

This court is not suggesting that very serious abuses of the class action process may not occur in civil litigation. The drafters of the Manual listed a number of egregious examples, and, doubtless, many others have occurred that are not included. The

---

**19.** *See Bernard v. Gulf Oil Co., supra,* 596 F.2d at 1260; *Waldo v. Lakeshore Estates, Inc., supra,* 433 F.Supp. at 793; *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l, Inc., supra,* 53 F.R.D. at 652 n.2.

This court reaches this conclusion even without consideration of the first amendment's protection of non-commercial speech that is not actually harmful, see *In re Primus,* 436 U.S. 412, 434, 437, 98 S.Ct. 1893, 1906, 56 L.Ed.2d 417 (1978), and does not present an imminent threat of harm, see *Craig v. Harney,* 331 U.S. 367, 373, 67 S.Ct. 1249, 1253, 91 L.Ed. 1546 (1947). In section IV, *infra,* this opinion addresses the limitations that the first amendment places on the regulation that the court does have power to issue.

drafters also noted, however, that, "generally, the experience of the courts in class actions has been favorable. The aforementioned abuses are the exceptions in class action litigation rather than the rule." Manual for Complex Litigation, Part 1, § 1.41 at 31 (1977). For these exceptional situations, courts may properly formulate specific rules and remedies instead of permitting their existence to justify an assumption that abuses are present or threatened.

## 2. *Rule 23*

As indicated earlier, Rule 83 does not permit the district court to regulate the conduct of the parties outside the court; but Rule 23(d)(3) may provide a source for such authority, as it gives the court "extensive power" to control the conduct of a class action. 7A C. Wright & A. Miller, Federal Practice and Procedure § 1791 (1972). Analysis of that rule must focus on the perimeters established by: (1) the authorization to impose "conditions on the representative parties or on intervenors"; and (2) the requirement that such orders be "appropriate." Consistent with the general view on the authority of courts to control class actions, this court reads "conditions" broadly to encompass many affirmative and negative controls on the parties. The Advisory Committee Notes support this interpretation, as they authorize conditions strengthening the representation by the class representative and imposing conditions on intervenors to assure the proper and efficient conduct of the action. Notes of Advisory Committee on the Federal Rules of Civil Procedure, Rule 23.

The term "appropriate" has not received judicial explication, but it is clear that, at a minimum, the term brings the consistency requirement again into play. An order under Rule 23 could not be appropriate if inconsistent with the policy of the rule. Thus, as under Rule 83, a trial court issuing an order restricting communications with potential class members under Rule 23(d)(3) must assure itself that the order will not hamper the class representative in prosecuting the class action, unless the court concludes that actual or threatened abuses of the class action process require issuance of the order.

If the court has additional general powers to issue orders under Rule 23, as the Fifth Circuit appeared to conclude in *Bernard, supra*, 596 F.2d at 1259–60, those powers, too, must be subject to the consistency limitation, because the powers can be no broader than the court's general powers under the Rule to control the progress of the class action litigation. Accordingly, the test for issuance of the order will remain the same.

## III. POWER OF THE COURT TO ISSUE THE ORDER REQUESTED

This opinion next turns to the order that defendants have proposed, focusing first on the specific prohibitions therein, and later on the more general provisions.

### A. Solicitation of Representation of Potential Class Members

The proposed order forbids plaintiffs and their counsel to solicit, directly or indirectly, legal representation of potential plaintiffs who are not formal parties to the action. The problems associated with such client solicitation are well known. As the Supreme Court stated in *Ohralik v. Ohio State Bar Association, supra*, 436 U.S. at 461, 98 S.Ct. at 1921 "[t]he substantive evils of solicitation have been stated over the years in sweeping terms: stirring up litigation, assertion of fraudulent claims, debasing the legal profession, and potential harm to the solicited client in the form of overreaching, overcharging, underrepresentation, and misrepresentation." (footnote omitted).

The Manual assumes that the trial court has authority to prevent solicitation, but it does not indicate the source for that authority. Manual, § 1.41. The Manual itself "cannot serve as a source of judicial power because the committee that drafted it possessed authority only to issue recommendations." *Pan American World Airways, Inc. v. U. S. District Court, Central*

District, California, 523 F.2d 1073, 1078 (9th Cir. 1975); see Manual for Complex Litigation xix-xx (1977). Like the *Rodgers, Coles* and *Bernard* courts, this court looks first to Rules 83 and 23. The Supreme Court's decision in *United States v. Hvass, supra*, suggests that Rule 83 provides this authority as to attorneys. *See also Gas-A-Tron of Arizona v. Union Oil of California, supra*, 534 F.2d at 1325. Although *Hvass* involved judicial rulemaking, the decision should apply equally to orders, since they are governed by the same "practice" language under Rule 83.

 Forbidding solicitation may also help the court assure the proper and efficient conduct of the action; thus the order may be an appropriate condition on the parties. If so, Rule 23 provides authority for the court's control, as well; and this control extends to both parties and their counsel. Control under either Rule 83 or Rule 23, of course, is subject to the previously outlined limitation that it not unnecessarily hamper progress of the class action.

The thorny problem in the analysis of the court's power to prevent solicitation lies in assessing the evils of the solicitation at issue and weighing them against the importance of solicitation to the progress of the class action. Considerations of constitutional protection of speech under the first amendment do not enter the balance unless the court first determines that it has the power to issue the order. Accordingly, the following discussion assumes that each aspect of the order discussed would pass constitutional muster and reserves constitutional assessment for only that portion of the order that the court does have the power to issue.

Nevertheless, the Supreme Court's evaluation of both the dangers and benefits of solicitation in recent constitutional decisions is directly relevant to the issue of this court's power to grant the requested order, because the greater the evils of solicitation, the more likely it is that the interest in preventing the evils outweighs the interest in facilitating the class action.

In *Ohralik v. Ohio State Bar Association, supra*, the Supreme Court upheld the right of a state bar association to discipline a lawyer in certain circumstances for purely commercial solicitation, in person, for pecuniary gain. Ohralik had solicited representation of two young women injured in an automobile accident and had entered a contract to represent them on a contingent fee basis. Distinguishing the function of solicitation from that of advertising prices of routine legal services, which was protected in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court observed:

> Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual.

*Id.* at 457, 98 S.Ct. at 1919 (footnote omitted). Noting that commercial speech receives a lesser level of protection than other forms of speech, *id.* at 455–56, 98 S.Ct. at 1918–19, the Court concluded that potential harm was sufficient to justify state regulation of in-person solicitation for pecuniary gain, *id.* at 462–68, 98 S.Ct. at 1922–25.

On the same day that the Supreme Court announced its decision in *Ohralik*, it also decided that a state could not constitutionally discipline a lawyer for soliciting legal representation on behalf of an organization that engaged in litigation as a form of political expression, not for pecuniary gain.[20] The Supreme Court's decision *In re Primus* was grounded on its conclusion that,

---

20. Of course, it was the practice of the ACLU, with whom Ms. Primus was associated, to ask

for awards of attorney fees. *In re Primus, supra*, 436 U.S. at 429, 98 S.Ct. at 1903.

where associational freedoms and political expression are involved, a lawyer may not be disciplined unless his activity actually is harmful.

The Court evaluated a letter that Ms. Primus had written to a woman who had been sterilized as a condition to continued receipt of public assistance. After an initial meeting with several women who had been sterilized, Ms. Primus wrote the letter indicating that the ACLU would be interested in supporting possible litigation. The Court found that there was no "undue influence, overreaching, misrepresentation, or invasion of privacy" in the solicitation, *In re Primus, supra,* 436 U.S. at 435, 98 S.Ct. at 1906, and noted:

> The letter imparted additional information material to making an informed decision about whether to authorize litigation, and permitted Williams an opportunity, which she exercised, for arriving at a deliberate decision. The letter was not facially misleading; indeed, it offered "to explain what is involved so you can understand what is going on." The transmittal of this letter—as contrasted with in-person solicitation—involved no appreciable invasion of privacy; nor did it afford any significant opportunity for overreaching or coercion. Moreover, the fact that there was a written communication lessens substantially the difficulty of policing solicitation practices that do offend rules of professional conduct.

*Id.* at 435–36, 98 S.Ct. at 1906–1907.

The solicitation at issue in the present proceeding bears significant similarities to that in *Primus.* The challenged solicitations that have occurred already have been in the form of advertisements and letters. Both presented respondents with an opportunity for deliberation; neither the advertisement nor the letters contained any misleading statements; there was even a lesser invasion of privacy than in *Primus,* because respondents to the advertisements surely contemplated receiving something in reply; and there was no significant opportunity for overreaching or coercion. Defendants may discover all the communications, be-

cause they are undoubtedly relevant, and this court may take whatever action that any abuses revealed thereby would warrant. *Gas-A-Tron of Arizona v. Union Oil of California, supra,* 534 F.2d at 1325.

Moreover, unlike the young women in *Ohralik,* recipients here were free from pressure to act upon the communication. Because plaintiffs did not ask for an immediate response, readers had ample opportunity for comparison and reflection.

Defendants have not asserted that plaintiff or his counsel met with persons who responded to the advertisement and coerced them to join the litigation. Indeed, defendants have argued that they were harmed because 22 persons responded to the first advertisement without any of them joining the action as named plaintiffs. This court confesses that it is bewildered by defendants' argument that these persons' non-joinder harms defendants. At the risk of reading an absent element into the argument, the court conjectures that defendants may have been suggesting that the advertising led individuals to consider that they had suffered discrimination when in fact they had not. Any injury that defendants would suffer thereby is much too minimal and too speculative to warrant proscription of the communications.

Alternatively, defendants may have feared that some of the 22 would eventually join the litigation. If the respondents to the advertisements are proper party plaintiffs, then their involvement in the prosecution of the suit early in the litigation is desirable, since the court will be adjudicating their rights. Under the 1966 amendments to the Federal Rules, class action judgments operate for or against all members of the class, except when the suit is brought under Rule 23(b)(3) and the class member opts out of the class. Advisory Committee Notes to the 1966 Amendment, Federal Rule of Civil Procedure 23.

In the case at bar, plaintiff sues alternatively under 23(b)(2) and 23(b)(3). Civil rights suits are the prototypical 23(b)(3) class actions, because by definition the defendant is taking action against the entire

class, and injunctive or declaratory relief with respect to the class as a whole is appropriate. Thus it is likely that, should this court certify the class, it will do so under Rule 23(b)(2). Accordingly, since there would not be any opportunity to opt out of the class, it is desirable to permit class members to become involved at an early stage in the litigation.[21] *See* Advisory Committee Notes to the 1966 Amendment, Federal Rule of Civil Procedure 23.

Finally, defendants may have thought that some of the respondents would now join the class but, without the advertising, would not have litigated their claims. In light of the operative effect of class action judgments under the Rules today, this viewpoint would have no merit.

■ Defendants, also complain of plaintiff's failure to disclose the second advertisement. It is true that if plaintiff had answered the second set of interrogatories with total candor, plaintiff would have disclosed his placement of the second advertisement; yet it is also true, as plaintiff contends, that the advertisement was not aimed directly at obtaining the names of potential class members. Nevertheless, while the advertisement did not lead plaintiff to learn of other persons who had allegedly suffered discrimination, such information easily could have resulted, and plaintiff should have disclosed his placement of the advertisement. Plaintiff's failure to give a candid response to an interrogatory focusing on his communications, however, is insufficient justification for an order forbidding such communications.

Defendants' major argument, however, focuses not on the specific harms that defendants may have suffered from the solicitation at issue, but on the theory that solicitation is harmful per se. They argue that the class action device should not be used to foster client solicitation. In support of this argument, defendants cite *Cherner v. Tran-*

*sitron Electronic Corp.*, 201 F.Supp. 934 (D.Mass.1962), where the court refused to authorize notice of pending litigation to all purchasers of securities who might have a cause of action against the named defendant. The Advisory Committee to the 1966 Amendment of the Federal Rules appears to concur, as it cites *Cherner* for the proposition that notice "should not be used merely as a device for the undesirable solicitation of claims."

*Cherner*, however, is quite a different case from the present litigation, and it was decided long before the Supreme Court indicated that solicitation, in limited contexts, could have substantial value. Significantly, the issue in *Cherner* was not solicitation by an attorney, but solicitation by the court through notification of potential parties to a spurious class action suit. *Id.* at 937. The court reserved comment on solicitation by the attorneys in the case, although a fair reading of the court's rationale suggests that the court would not approve such attorney solicitation, either. The decision in *Cherner* was rooted in the court's concept of the limited role of the judiciary in the vindication of statutory rights. *Id.* at 936–37.

■ In the present litigation, by contrast, the vindication of a constitutional right is at stake, as it was in *Primus*. The societal interest in assuring individuals access to information regarding vindication of these rights is indisputable. *See NAACP v. Button*, 371 U.S. 415, 429–37, 83 S.Ct. 328, 335–40, 9 L.Ed.2d 405 (1963); *Rodgers v. United States Steel, supra*, 508 F.2d at 166. This court is not suggesting that there is any proper judicial role in going outside the limits of decision making to guarantee constitutional rights, but only that the court must long hesitate before taking any action that impairs access to information pertaining to vindication of constitutional rights. As the drafters of the Manual themselves

---

**21.** The Ninth Circuit's decision in *Pan Am. World Airways, Inc. v. Dist. Ct.*, C.D.Cal., 523 F.2d 1073 (1975), does not mandate a different conclusion. The court there held that the district court had no power to issue notice to potential plaintiffs in air crash litigation prior to class certification. The issue of communications from the class representative to potential class members presents an entirely different question that was not before the *Pan Am.* court.

concluded, "[i]n many cases, the class members will have knowledge of facts relevant to the litigation and to require a party to develop the case without contact with such witnesses may well constitute a denial of due process." Manual for Complex Litigation, Part 1, § 1.41.

Another important factor distinguishes *Cherner* from the instant suit. The action there was a "spurious" class action, in which judgment would extend only to the parties, including intervenors. Thus it was logical to conclude that notifying potential plaintiffs stirred up litigation, because if they did not join the suit, the court would not adjudicate their rights. The interest in preventing barratry is not implicated here, however: plaintiff and his counsel are not stirring up litigation, because plaintiff has already filed suit, and any class members located through the advertisements would be part of the class in any case.

This court earlier assayed the other evils generally associated with solicitation. None of those evils is present in or threatened by the conduct of plaintiff or his counsel. Plaintiff's counsel is not seeking representation of parties from whom she can obtain a portion of the recovery. Plaintiff has brought this action under 42 U.S.C. § 1983 and under Title VII. If Zarate ultimately prevails, and the court awards attorney fees, the amount of the award will depend upon such factors as: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the amount in controversy and the results obtained; and (4) the experience, reputation and ability of the attorney. *See Fountila v. Carter*, 571 F.2d 487 (9th Cir. 1978). Thus, there is no direct relationship between solicitation of clients and remuneration to plaintiff's attorney. *See In re Primus, supra*, 436 U.S. at 430, 98 S.Ct. at 430.[22]

Nonetheless, this court does recognize that even without contingent fees, plaintiff's counsel does have a financial interest in the successful prosecution of the action. As the above-enumerated factors reveal, the award of attorney fees does vary with the party's success in obtaining the relief he seeks. *See Sethy v. Alameda County Water District*, 602 F.2d 894 (9th Cir. 1979). If plaintiff's counsel, through the advertisements and letters, obtains information about class members that helps move the court to certify the class, and if plaintiff then prevails in his suit, plaintiff's counsel will likely receive greater fees than she would have had she represented plaintiff alone. Although this court does not doubt that this financial motivation can affect the decision to conduct such solicitation as occurred here, it is nonetheless clear that the monetary relationship described is a far cry from that involved in the ambulance-chasing at which anti-solicitation rules are aimed. Plaintiff's interest in obtaining information from potential class members to help him prosecute the action far outweighs the governmental interest in preventing plaintiff's counsel from seeking to increase her fee. In addition, that government interest is no justification for an order operating against plaintiff, himself. Moreover, with respect to his attorney's solicitation, since the award of attorney fees is within the court's discretion, the court can easily take any solicitation by counsel into account in making its fee determination. *See Pete v. United Mine Workers of America Welfare and Retirement Fund of 1950*, 171 U.S. App.D.C. 1, 17, 517 F.2d 1275, 1291 (D.C.Cir. 1975); *Kiser v. Miller*, 364 F.Supp. 1311, 1319 (D.D.C.1973). The courts' power to do so is clear; on occasion, courts have even

---

22. The *Primus* court observed:

[I]n a case of this kind there are differences between counsel fees awarded by a court and traditional fee-paying arrangements which militate against a presumption that ACLU sponsorship of litigation is motivated by considerations of pecuniary gain rather than by its widely recognized goal of vindicating liberties. Counsel fees are awarded in the discretion of the court; awards are not drawn from the plaintiff's recovery, and are usually premised on a successful outcome; and the amounts awarded often may not correspond to fees generally obtainable in private litigation.

*In re Primus, supra*, 436 U.S. at 429–30, 98 S.Ct. at 1903.

refused class certification becaus e of abusive solicitation practices. *See, e '. g., Carlisle v. LTV Electrosystems, Inc.,* 54 F.R.D. 237 (N.D.Tex.1972).

There is no threat here of asse rtion of fraudulent claims, or of overreachir g, overcharging, underrepresentation or m isrepresentation by plaintiff or plaintiff's counsel to those solicited. The *Ohralik* co urt believed that those risks were tied clo sely to an attorney's solicitation of clients, in person, for pecuniary gain, and that su ch circumstances increased the risk a lways present that the attorney would pu t his interests ahead of the client's. *Ohra lik v. Ohio State Bar Associat ion, supra,* 436 U.S. 461 n.19, 98 S.Ct. 1921 .n.19. As indica ated earlier, the absence of in-person solic ita-tions here reduces, if n ot eliminates, the likelihood of these evils ensuing, and the court's powers to set the attorney's fee, a nd to monitor the quality of representation, s ee Fed.R.Civ.P. 23(a)(4); 23 (d)(3), further r e-duce any risk of harm flowing from solicit tion.

The evil announced in *Ohralik,* debasement of the legal professi on, certainly does flow from the type of tactics there condemned, but the solicitat ion at issue here presents no such problem. Where a state, through professional disciplinary rules, has condemned such tactics, t his court has no doubt that it may protect the integrity of its processes and effectua te the policy of the state's disciplinary rules by proscribing the forbidden conduct. *See* Calif.Code of Professional Responsibility 2–101(B). Here, however, there is no eviden ce that the conduct of plaintiff's counsel threatens any debasement of the profession; indeed, the foregoing discussion indicat es that the solic-itation was a perfectly proper attempt to gain information to facilitate the class action.

 This court will not exercise its inherent power to enforce st ate disciplinary rules against attorneys appearing before it when the exercise of that power would unduly hamper the progress of the class action. As before, this court concludes that the balance is weighted heav ily in favor of permitting the solicitation because of its importance to the class action.

Additional problems with solicitation call for consideration. The editors of the Manual addressed the problems in the context of class actions, specifically, and concluded:

> To the party solicited, solicitation may appear to be an authorized activity approved by the court, simply because of reference to the title of the court, the style of the action, the name of the judge, and to official processes. Such unapproved solicitation may be of doubtful ethical propriety and may result in well founded dissatisfaction with the judicial management of the action.

Manual, *supra,* at 27.

The solicitations at issue here, and others likely to arise in this litigation, present little danger that parties would misconceive them as authorized activities approved by the court. If any such impression did arise, it would be attributable to a misrepresentation by the communicating party and, therefore, proscribable under the court's power to prevent misrepresentations, discussed *infra* in section III D of this opinion.

## B. *Solicitation of Fees and Expenses*

The requested order forbids solicitation of fees and expenses and agreements to pay fees and expenses from potential plaintiffs in intervention who are not formal parties to the action. This provision apparently aims at prevention of maintenance, where a person or entity intermeddles in litigation by providing a party to the litigation with the means to prosecute the lawsuit. At the outset, this court notes that it would not approve any such provision unless it operated equally against defendants. The following analysis assumes that the order would be modified to reflect that change.

██ ██ The preceding discussion of the court 's power to control client solicitation by at torneys under Rule 83 and parties and attorr leys under Rule 23, and of the court's inhere nt power, determines the result here, as well . The court may prevent solicitation of fun d s if solicitation of funds presents an

evil that outweighs the value of the solicitation to the maintenance of an appropriate class action. The potential for harm in financial solicitation is clear: interested non-parties could finance a war of dollar attrition that would lead parties of lesser means to capitulate. Regrettably, great financial imbalances between parties often do have that effect. Sometimes, however, solicitation of financial support will have the opposite result. Associations with political interests closely allied with those of a party of limited means may provide that party with the wherewithal to vindicate an important right. The situation in the instant case falls in that latter category. Zarate is a member of a number of community organizations that might wish to support his attempt to eliminate alleged racial discrimination against Hispanics. If any abuses resulted, the court could then take remedial measures, such as requiring the party to fund corrective communications.

The American Bar Association has indicated that activity by a client or his attorney to elicit support from these groups was not improper. In 1973, the Committee on Professional Ethics endorsed a scheme where the original individual client of a class attorney would finance mail solicitation of potential class members for immediate funds and for authorization to retain the attorney for a 35 per cent contingent fee and to assign himself a 12 per cent fee from the recovery. A.B.A. Comm. on Prof. Ethics, Op. No. 1280 (1973). Two years later, the Committee concluded that it was ethically proper for an attorney to solicit funds for expenses in connection with preparation for litigation of a class action claim, including the expense of mailing notice. Moreover, the attorney could receive funds solicited by one class member from others for the attorney's compensation, although he could not, himself, solicit funds from class members for his compensation. A.B.A. Comm. on Prof. Ethics, Op. No. 1326 (1975).

## C. Solicitation to Take a Position Concerning the Action

The order forbids parties to the action to solicit potential plaintiffs who are not formal parties to take a position concerning the action. The Manual's proposed rule does not contain such a provision. As with the solicitation of funds, the court notes at the outset that the order would not operate against defendants' solicitation of support from non-parties; fundamental fairness requires that the order operate equally against both parties.

■■ Even assuming this equality, however, this court doubts that Rule 23 vests in district courts any authority to control communications urging essentially political activity. See Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 258 (7th Cir. 1975). Conceivably, in an antitrust or securities class action, a court might wish to issue an order controlling speech for a brief period to preserve the status quo pending resolution of a controversy.[23] See 11 C. Wright & A. Miller, Federal Practice & Procedure § 2951. If business entities took positions favoring one side or the other in such actions, the statements could jeopardize business relationships, or cause serious changes in market prices of securities. A district court, then, would have power to control speech in those limited contexts, subject, of course, to the severe constraints that the first amendment places on government regulation of speech advocating that another take a position.

■ Here, however, defendants have not shown and the court cannot conceive any reasons that its power to control attorneys appearing before it or impose conditions on parties to class actions gives it any authority to prevent a party from urging another to speak out concerning the action. The interests favoring such speech are enormous. Assume, for example, that Zarate

---

**23.** If the controls affected speech protected by the first amendment, they might still fall within the narrow exceptions to the normal prohibition against prior restraints. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975). This opinion addresses the prior restraint issue in Section IV.

wished to request that a Mexican-American organization take a stance in support of his position. The communication could foster solidarity among the alleged victims of discrimination and their friends, thereby strengthening Zarate's resolve to pursue the litigation, *see Bernard v. Gulf Oil, supra,* 596 F.2d at 1269 (Godbold, J., dissenting); and perhaps, if the city were in fact discriminating, the communication might help induce it to cease the practices. The ability to speak out on political issues lies at the heart of our system of government. *See* A. Meiklejohn, Political Freedom 255 (1960). There is no societal interest in suppression of such speech. Accordingly, the balance tips overwhelmingly against this aspect of the order.

#### D. *Misrepresentations Casting Aspersions*

■ The proposed order forbids "communications from counsel which may tend to misrepresent the status, purposes and effects of the action, and of any court orders therein, which may create impressions tending, without cause, to reflect adversely on any party, any counsel, this court, or any administration of justice." It is obvious that harm to the parties and to the processes of the court may flow from misrepresentations. For that reason, Rules 83 and 23 give the court power to control misrepresentations by attorneys appearing before it. In addition, the inherent power of the court to protect the administration of justice is undisputed. *See Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Pennekamp v. Florida,* 328 U.S. 331, 347, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295 (1946); *Chicago Council of Lawyers v. Bauer, supra,* 522 F.2d at 248. Rooted in common law traditions, *see Bridges v. California,* 314 U.S. 252, 260, 62 S.Ct. 190, 192, 86 L.Ed. 192 (1941), this power undoubtedly comprehends protection of the court, itself, as well as protection of parties before it. *Pennekamp v. Florida, supra,* 328 U.S. at 347, 66 S.Ct. at 1037.

■ Counsel have no conceivable legitimate interest in making misrepresentations, so the court need not consider any benefit that might inure to the class action proceeding from such communications. Therefore, this court concludes that, subject to significant constitutional limitations, it has authority to issue this aspect of the order. Section IV of this opinion assesses these limitations. First, however, the two more general provisions of the submitted order require analysis.

#### E. *All Communications with Potential Plaintiffs*

■ An omnibus provision of the order forbids all parties and counsel from directly or indirectly communicating concerning the action with any potential plaintiff not a formal party to the action without the consent and approval of the court. Defendants make no attempt to justify this blanket prohibition; nor could any such attempt be fruitful. The only conceivable interests that defendants have in preventing communication to potential plaintiffs are those enumerated above and covered by specific provisions of the order. The court's obligation to avoid unduly restricting the progress of the class action outweighs each of those interests except for the interest in preventing misrepresentations. Accordingly, the court has no power to issue this more general provision.

■ Supplementing the requested general proscription is a requirement that parties submit any proposed communication to the court together with a list of addressees. Arguably, the court does have some legitimate role in screening communications during a class action. For example, Rule 23(d)(2) authorizes the court to supervise the notice to class members. The court may require that the notice be neutral and objective in tone, neither promoting nor discouraging the assertion of claims. *See Philadelphia Electric Co. v. Anaconda American Brass Co.,* 43 F.R.D. 452 (E.D.Pa. 1968). The case at bar, however, has not reached a stage where such notice is appropriate. The court has no power to screen other communications that do not present a threat of harm that justifies proscription. Because misrepresentations do justify pro-

scription, arguably the court could assume an appropriate judicial function in screening communications to prevent misrepresentations. Upon analysis, *infra*, however, it is apparent that the severe constraints on governmental oversight that the first amendment imposes will prevent the court from instituting such a prior approval process.

## IV. PERMISSIBILITY OF THE COURT ORDER UNDER THE FIRST AMENDMENT

Like the court in *Rodgers v. United States Steel, supra*, this court thus far has avoided discussion of the "serious first amendment issues," *id.* at 162, that this order raises, because it is without power to approve most aspects of the order. The court's undoubted power to control misrepresentations so that it may protect the administration of justice, however, necessitates a constitutional analysis of the portion of the order directed at those misrepresentations.

▮ In a commercial context, it is clear that government may control speech that is deceptive or misleading. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976). In fact, in certain settings, a government may even regulate commercial speech that is potentially misleading. *Friedman v. Rogers*, 440 U.S. 1, 13, 99 S.Ct. 887, 896, 59 L.Ed.2d 100 (1978). This treatment of commercial speech differs markedly from that accorded noncommercial speech, where government may regulate only with narrow specificity, upon a showing that the speech proscribed is actually harmful. *In re Primus, supra*, 436 U.S. at 434, 437, 98 S.Ct. at 1906–1907; *see Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

A comparison of the Court's analyses in *Ohralik* and *Primus* highlights this difference in treatment. In *Ohralik*, which involved purely commercial speech, the Court concluded that in a situation "which is inherently conducive to overreaching and other forms of misconduct, the State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful solicitation by lawyers whom it has licensed," *Ohralik v. Ohio State Bar Assoc., supra*, 436 U.S. at 464, 98 S.Ct. at 1923, and may therefore, "regulate in a prophylactic fashion," *In re Primus, supra*, 436 U.S. at 437, 98 S.Ct. at 1907. "In a context of political expression and association, however," the *Primus* court observed, "a State must regulate with significantly greater precision." *Id.* at 437–38, 98 S.Ct. at 1908 (footnote omitted). Thus, in *Primus*, the Court required a showing that the solicitation at issue in fact led to the evils at which the anti-solicitation ban was aimed. *In re Primus, supra*, 436 U.S. at 434, 98 S.Ct. at 1906. These principles apply equally to the federal government under the first amendment.

▮ Earlier in this opinion, this court indicated that the communications at issue here bore significant factual similarities to those in *Primus*. There are important legal similarities as well. Granted, Zarate's counsel is not an attorney for a political association like the NAACP or the ACLU, and, therefore, she does not have associational ties that call for the first amendment's strongest protection. Nonetheless, plaintiff Zarate is a member of a number of political associations, and those associations have a constitutional right to access to political information. *See First National Bank of Boston v. Bellotti, supra*, 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707 (1978); *Red Lion Broadcasting v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969). In addition, "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transportation Union v. Michigan Bar*, 401 U.S. 576, 585, 91 S.Ct. 1076, 1082, 28 L.Ed.2d 239 (1971). Zarate instituted the present litigation to vindicate the constitutional right of Hispanics not to suffer discrimination by a governmental unit. Communications about the litigation and communications about the challenged government actions both warrant the fullest first amendment protection.

■ The first amendment, therefore applies with full force to the speech of plaintiff's counsel about the issues in and progress of the litigation. Even more clearly, the first amendment protects the speech of plaintiff, himself. That does not mean, of course, that the court cannot regulate the speech; even where first amendment protection is involved, the court clearly is authorized to protect the proper administration of justice. *Farr v. Pitchess*, 522 F.2d 464, 468 (9th Cir. 1975). When it does so, however, the constitutional protection of the speech requires that the court only forbid communications if they pose a " 'serious and imminent threat' of interference with the fair administration of justice." *Chicago Council of Lawyers v. Bauer, supra*, 522 F.2d at 249; *see Craig v. Harney*, 331 U.S. 367, 373, 67 S.Ct. 1249, 1253, 91 L.Ed. 1546 (1947); *In re Oliver*, 452 F.2d 111, 114 (7th Cir. 1971). A "reasonable likelihood" of such interference is inadequate to warrant proscription. *Chicago Council of Lawyers v. Bauer, supra*, 522 F.2d at 242; *Bridges v. California*, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941).[24]

■ Applying this standard to the order that defendants request, it is clear that the language is fatally defective in two respects. Instead of proscribing communications which misrepresent some aspect of the action and which reflect adversely on the administration of justice, the order forbids communications which *may tend to misrepresent* some aspect of the action and which *may create impressions tending to reflect adversely* on parties, counsel, the court or the administration of justice. The order is vague, because it does not provide a person of ordinary prudence with notice as to what he may not say. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). Moreover, it is overbroad, because it forbids speech that, upon analysis, does not pose any serious and imminent threat of interference with fair administration of justice.[25] *See Nebraska Press Association v. Stuart*, 427 U.S. 539, 568, 96 S.Ct. 2791, 2807, 49 L.Ed.2d 683 (1976).

A conclusion that the speech involved was more closely akin to commercial speech would not have mandated a different result. Even though the Supreme Court has given government greater leeway in its regulation of commercial speech, the hazy "may tend to" and "may create impressions tending" language of the order would not pass constitutional muster.

■ Nor could this court save the order by inserting the Manual's suggested exemption for constitutionally protected speech.

**24.** *But see United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969) (reasonable likelihood of prejudicial news which would make difficult the impaneling of an impartial jury and tend to prevent a fair trial is sufficient to support a court order forbidding attorneys, defendants and witnesses from public statements about jurors, the evidence, or the merits of the case). The *Tijerina* decision appears to conflict with the Supreme Court's decision in *Bridges v. California, supra*, finding "reasonable likelihood" to be an inadequate standard. Rather than rendering *Bridges* inapplicable, as the court there concluded, the existence of a court order in *Tijerina* should make the interests protected in *Bridges* all the more compelling, because it operates as a prior restraint. (For discussion of the constitutional problems of prior restraints, see the text of the opinion, *infra*.) As the Supreme Court later made clear, prior restraints by court order are subject to greater, not lesser, scrutiny. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

**25.** In addition, defendants have not cited any authority for the proposition that there is a strong governmental interest in protecting the parties. *See Bernard v. Gulf Oil Co., supra*, 596 F.2d at 1273 (Godbold, J., dissenting). *But see Pennekamp v. Florida*, 328 U.S. 331, 347, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295 (1946). On the one hand, there is the conceded legitimacy of temporary court orders preserving the status quo when irreparable harm is threatened; this interest sometimes justifies imposition of a prior restraint. *See* footnote 23, *supra*. On the other hand, the usual remedy for statements that damage a party is money damages in a libel or slander action, not prepublication restraint; and that usual remedy, of course, is available only in circumstances falling within strict standards imposed by the first amendment. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

As Professor Laurence Tribe observed in analyzing a similar, hypothetical, statute, "[t]he problem with that solution is that it simply exchanges overbreadth for vagueness." L. Tribe, American Constitutional Law § 12–26 at 716 (1978). Because issues of constitutional protection seldom are clear cut, exempting constitutionally protected communications from the operative effect of the order without defining them does not give the parties adequate notice as to whether they will face contempt proceedings for engaging in speech. The chilling effect of the order would remain, because of the putative speaker's fear of guessing wrong, *New York Times v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964), and the cost of litigation, *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 50, 91 S.Ct. 1811, 1823, 29 L.Ed.2d 296 (1971). Instead, the court must limit any order to forbidding, in clear terms, specified constitutionally proscribable speech.

■ The preceding constitutional difficulties would beset the defendants' requested order even were it enacted, as the drafters of the Manual suggest, in the form of a local rule. Its issuance as an order, however, poses an even more serious problem: the order is a classic prior restraint, and, therefore, subject to a " 'heavy presumption' against its constitutional validity."[26] *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971); *see Nebraska Press Association v. Stuart, supra*, 427 U.S. at 558, 96 S.Ct. at 2802. As the Supreme Court observed in *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975):

[A] free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legiti-

---

**26.** Arguably, a local § 1.41 rule would be a prior restraint, as well. As the Seventh Circuit observed in *Chicago Council of Lawyers v. Bauer, supra*, 522 F.2d at 248: "A violation of the rules can be punished by the contempt power just like a failure to obey an injunction. The full criminal procedural safeguards, including the right to trial by jury, would not necessarily be available."

Nonetheless, the *Bauer* court concluded that the rules challenged there were not a prior restraint because "[n]ormally, a 'prior restraint' constitutes a predetermined judicial prohibition restraining specified expression and it cannot be violated even though the judicial action is unconstitutional if opportunities for appeal existed and were ignored. *See Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). The validity of court rules, however, can be challenged by one prosecuted for violating them . . . ." *Chicago Council of Lawyers v. Bauer*, 522 F.2d at 248. *See also Waldo v. Lakeshore Estates, Inc.*, 433 F.Supp. 782, 789 (E.D.La.1977), where the court used a similar analysis to find no prior restraint, but relied also on an exemption in the order for speech that is constitutionally protected.

The problem with the court's conclusion is that it lets the determination of whether a restriction is or is not a prior restraint turn on a procedural consequence that flows from a 1967 Supreme Court decision. That consequence may make a court order a more serious invasion of first amendment freedoms, but it should not be the sole touchstone determining whether

or not a restriction is a prior restraint. The Supreme Court condemned prior restraints long before it decided in *Walker* that a party could not violate a court order and assert its unconstitutionality as a defense but must, instead, appeal the order. *See* L. Tribe, American Constitutional Law, § 12–31–32.

A § 1.41 rule also appears to be a prior restraint because, unlike the *Bauer* rule, it requires that parties submit proposed communications to the judge so that he may decide whether or not they may distribute them. Yet, the rule provides no standards to govern this "permit" system. The government may not be given censorship authority over "political speech in which the element of timeliness may be important," *Carroll v. Commissioner of Princess Anne*, 393 U.S. 175, 182, 89 S.Ct. 347, 352, 21 L.Ed.2d 325 (1968), unless narrow, precise standards complying with first amendment guidelines are followed, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969). *See Southeastern Promotions, Ltd., v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1253, 43 L.Ed.2d 448 (1975).

For similar reasons, this court cannot agree with the *Waldo* court's conclusion that an exemption for constitutionally protected speech eliminates any possibility of finding that the order constitutes a prior restraint. Again, the absence of standards is fatal, and, as discussed in the text of the opinion, *supra*, the chilling effect of the order is an impermissible restriction on freedom of speech.

mate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

(Emphasis in original)

In the present case, the difficulties are compounded because a court would be issuing the order, and the court would have contempt power available to punish the violators. Moreover, because of the Supreme Court's decision in *Walker v. Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), violators of the order could not even raise its unconstitutionality as a defense in a contempt proceeding.[27]

In case the court were inclined to overlook the prior restraint issue presented by the misrepresentation section of the order, the "screening" section of the order poses the issue squarely by asking the court to pass judgment on all communications from plaintiff or his counsel. Reduced to its basics, this aspect of the order would have the court issue "permits" before the plaintiff could speak. Directing the court to exercise "minimal judicial control of these communications," Manual for Complex Litigation, Part 1, § 1.41 at 29, cannot save the system from first amendment condemnation. "The settled rule is that a system of prior restraint 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'" *Southeastern Promotions, Ltd. v. Conrad, supra,* 420 U.S. at 559, 95 S.Ct. at 1247, *quoting Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965). The constitution simply does not permit the court to assume such a role where the speech involved falls within the first amendment's traditional ambit.

All that is permissible is a narrow proscription of communications from counsel which misrepresent the status, purposes or effects of the action and of any court orders therein, and which pose a serious and imminent threat to interference with the fair administration of justice. Defendants have made no showing that any actions by plaintiff suggest any such threat.[28] Absent such a showing, this court sees no purpose in issuing the order, even in modified form.

*CONCLUSION*

A district court may not approve an order that hampers the progress of an appropriate class action unless it first concludes that actual or threatened abuses of the class action process outweigh the interest in facilitating the action. The only provision of the proposed order restraining communications with potential class members that meets this threshold test is the proscription of misrepresentations. That proscription, however, is unconstitutionally vague and overbroad, and it poses an impermissible prior restraint. A court could issue that portion of the order only if the language of the order limited control to situa-

---

**27.** A different result might obtain if the district court issued a rule that was void on its face as unconstitutionally overbroad or vague. A person may communicate without court permission, in violation of the rule, and challenge its application in subsequent proceedings against him. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). He may not similarly avoid the authority of licensing agents operating under a statute that is valid on its face but invalidly applied, however, if he could have obtained prompt judicial review of the decision against him. *Poulos v. New Hampshire,* 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1958).

**28.** Defendants have argued that they were harmed by plaintiff's advertisements because they gave potential job applicants the impression that the county discriminated against His-

panics. If the county does discriminate, of course, it has no legitimate interest in protection against publicity about its policy. If it does not discriminate, the advertisements may cause the county some harm. Any such harm may be mitigated, however, by publicity surrounding a judgment vindicating defendant, by county press releases, and by county employment advertisements indicating that the county is an equal opportunity employer. It would be inappropriate to restrain the plaintiff's advertisements in advance when the Supreme Court's libel decisions do not even allow subsequent punishment for advertisements libeling government officials absent proof of knowledge of or recklessness as to falsity. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1954).

tions that posed a serious and imminent threat to the fair administration of justice. The actions of plaintiff and his counsel in the present litigation pose no such threat; therefore this court declines to issue the order as requested or as modified to reflect constitutional considerations.